**W. H. WHITMAN and Mary E. Whitman**

**v.**

**UNITED STATES of America.**

**Civ. A. Nos. 10518, 10519.**

United States District Court
W. D. Louisiana,
Monroe Division.

Dec. 28, 1965.

Paul K. Kirkpatrick, Hudson, Potts & Bernstein, Monroe, La., for plaintiffs.

Robert I. White, Atty., Tax Div., U. S. Dept. of Justice, Fort Worth, Tex., Edward L. Shaheen, U. S. Atty., and Edward V. Boagni, Asst. U. S. Atty., Shreveport, La., for the Government.

BEN C. DAWKINS, Jr., Chief Judge.

These consolidated actions were brought by the plaintiffs, husband and wife, for refund of income taxes which were assessed against and paid by them for the calendar and taxable years of 1960 and 1961, together with interest, in the aggregate amount of $1,706.86, plus statutory interest. This Court has jurisdiction over the parties and over the subject matter under 28 U.S.C. § 1346(a)(1).

The plaintiffs filed timely joint income tax returns for 1960 and 1961. Upon audit and review of the returns, the Commissioner of Internal Revenue disallowed deductions claimed under Internal Revenue Code of 1954, section 162(a), for travel expenses while away from home in the pursuit of a trade or business and section 165(a) or section 172 for net operating losses incurred in the operation of plaintiffs' farm. Upon payment of the deficiencies assessed and disallowance of a timely claim for refund, this suit was instituted.

W. H. Whitman was born and reared on a farm near Ruston, Louisiana. Following termination of his service with the U. S. Army in 1946, he found work in the pipeline construction industry. He and his wife have followed that industry since 1946 all over the United States and Canada. They returned to Ruston and environs between jobs and stayed with their parents. Ultimately becoming dissatisfied with this arrangement, Whitman purchased a nine room house in Choudrant, Louisiana, in 1954. The house was selected by Whitman's father, who immediately moved into the place, as the house in which he had been living had become intolerable for lack of running water. The elder Whitman had quit farming and was following the carpentry trade.

W. H. Whitman maintained the new home and paid the utility bills for his aging parents. He received his mail at the Choudrant, Louisiana, post office, where his father kept a box. It does not appear whether the elder Whitmans received any income other than support furnished by W. H. Whitman. A room in the Choudrant home was set aside especially for Whitman and his wife when they were visiting there. From 1954 through the years here under consideration, Whitman continued to follow the pipeline construction business, visiting in Choudrant for periods varying from a few days to two months.

Whitman and his wife had adopted the practice of living in a house trailer which could be moved from job site to job site as early as 1949. In 1959 they purchased a new trailer for $4,000. Whitman had worked on different jobs since 1957 for the same employer, Panama, Inc., of Houston, Texas, who reimbursed some of the expenses incurred in moving the mobile home from place to place. This arrangement was so convenient to plaintiffs that when they adopted a child in February, 1961, the family of three continued to reside in the trailer.

Whitman, however, considers Choudrant his home. He has bank accounts both in Choudrant and in Chatham, Louisiana. He has Louisiana license plates and a Louisiana driver's license. He pays Louisiana State Income Taxes. Whitman belongs to a Shreveport local of a labor union, but, as his employment has been obtained through personal contact with the same employer for several years, he does not rely upon the union to find employment.

Whitman's claimed deductions under section 162(a) (2) include meals at $4.50 per day, trailer space rent at $1.50 per

day, and depreciation on his trailer, using the double declining balance method of computation, for a total of 301 days in 1960 and 315 days in 1961.

In 1959 Whitman purchased a farm consisting of 143 acres near Chatham, Louisiana. In addition he purchased six cows, making an arrangement with the seller of the land to tend to the place in Whitman's absence in return for all male offspring of the cattle. Although no transactions occurred in the years 1960 and 1961, Whitman has since acquired additional acreage and presently owns a herd of fifty-five cattle. It was his intention to build his herd up to 120 to 160 animals by 1967 or 1968, at which time he would leave the pipeline construction business and devote all his time to his cattle business. Whitman received no income from the operation in the taxable years here under consideration, and has received little since. Thus the operation had not reached the status of a full-fledged operating business. The Commissioner has taken the position with respect to the claimed deductions for current expenses, which amounts to a net operating loss in the plaintiff's farming operation, that those expenditures must be capitalized as part of the basis of land or cattle and recovered in later years through depreciation and sale of the assets.

With respect to the two questions presented by this case, we hold that the Commissioner was correct in his disallowance of plaintiff's deductions for traveling expenses while away from home, but incorrect in his disallowance of plaintiff's deduction for farming losses.

The basic statutory provisions to be considered in determining the deductibility of traveling expenses are sections 162(a) and 262 of the Internal Revenue Code of 1954. Section 162(a) provides for the deduction of all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Congress explicitly included as examples of ordinary and necessary business expenses "traveling expenses (including the entire amount expended for meals and lodging) while *away from home* in the pursuit of a trade or business." (Emphasis added) On the other hand, section 262 specifies that no deduction shall be allowed for personal, living, or family expenses.

Although the term "home" is one of the most commonly used words in the English language, its definition under the Code had confounded the Supreme Court on two separate occasions.[1] It has been argued that Congress gave no consideration to the formulation of a definition of "home" other than that which was in common usage at the time of the enactment of the provision.[2] But speculating whether or not "home" should have a common or a technical meaning does not benefit our analysis of the particular dispute before us. Our determination must be whether a claimed place of abode is the taxpayer's regular place of abode in a real and substantial sense and whether the facts as a whole tend to show that the undertaking of jobs away from the point where business contacts are normally maintained is primarily for business rather than for personal reasons.[3]

The myriad authorities dealing with a claimed deduction under section 262(a) generally tend to fall into three categories: The first of these may be called the commuter cases, in which the taxpayer, for personal reasons, lives in one place and works in another. The high watermark of these cases is perhaps Commissioner of Internal Revenue v. Flowers, 326 U.S. 465, 66 S.Ct. 250 (1946), in which Flowers, an attorney living in

1. Commissioner of Internal Revenue v. Flowers, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203 (1946) rev'g Flowers v. Commissioner of Internal Revenue, 148 F. 2d 163 (5 Cir. 1945); Peurifoy v. Commissioner of Internal Revenue, 358 U.S. 59, 79 S.Ct. 104, 3 L.Ed.2d 30 (1958).

2. See Haddleton, Traveling Expenses "Away From Home," 17 Tax L.Rev. 261 (1962).

3. See Rev.Rul. 60-189, 1960-1 Cum.Bull. 60.

Jackson, Mississippi, was employed by a railroad which required him to work in Mobile, Alabama. In denying any deduction for expenses the Supreme Court held that Flowers's choosing to live at an unusual distance from his place of employment could not convert commuting living expenses into business expenses since such expenditures would not be required by "the exigencies of the business."[4]

■■ A second group of cases concern taxpayers whose employment may be located in places away for their desired residence. As early as 1927, in Mort L. Bixler, 5 B.T.A. 1181, it was held that "traveling and living expenses are deductible * * * only while the taxpayer is away from his place of business, employment, or the post or station at which he is employed, in the prosecution, conduct, and carrying on of a trade or business." From this reasoning the Commissioner developed the concept of the "tax home" as allowing the deduction of traveling expenses only while away from the taxpayer's *post of duty or place of employment*. Thus the taxpayer's "home" for traveling purposes is usually at the city in and around which he usually works. If he can show he is temporarily employed at another business location, he may be "away from home." The Tax Court in Harvey v. Commissioner of Internal Revenue, 32 T.C. 1368 rev'd 283 F.2d 491 (9 Cir. 1960), found the taypayer employed away from home for more than a temporary period, and disallowed the deduction, citing Peurifoy v. Commissioner of Internal Revenue, 358 U.S. 59, 79 S.Ct. 104 (1958), as authority for the rule that the place where the taxpayer is employed for an "indefinite" period is his "tax home."[5]

The third category involves the worker who generally spends more time traveling than those in the second group, although each place of employment is conceded to be temporary since he customarily moves from one job to the next. In the cases where the commissioner has been successful in denying the deduction,[6] the taxpayer is characterized as a "boomer" or an itinerant worker; in the cases where the taxpayer prevailed, he is

4. Accord Steinhort v. Commissioner of Internal Revenue, 335 F.2d 496 (5 Cir. 1964) (taxpayer's claim for deduction was denied although he was obliged to drive his car from his home to an uninhabitable place where he boarded a vessel); Hammond v. Commissioner of Internal Revenue, 213 F.2d 43 (5 Cir. 1954) (taxpayer went weekly from New Orleans, his home, to Baton Rouge to work for the State Highway Department; his deduction was disallowed); cf. Wright v. Hartsell, 305 F.2d 221 (9 Cir. 1962) (where a deduction for traveling expenses was allowed when it was impossible for taxpayer to live at the job site); Crowther v. Commissioner of Internal Revenue, 269 F.2d 292 (9 Cir. 1959) (where a logger who was required to live at a considerable distance from his place of employment was allowed a deduction).

5. The "temporary" and "indefinite" duality has long been followed by the Tax Court. See Cooper, ¶ 53,149 P–H Memo TC (taxpayer and wife resided in Memphis, where she usually remained; he was a journeyman steamfitter and looked to local union for work; in finding for the taxpayer the Tax Court held his work was temporary in nature); Frazier, ¶ 53,325 P–H Memo TC (similar); Den-

ning, ¶ 55,210 P–H Memo TC; Stegner, ¶ 55,276 Memo TC (plumber and pipefitter); cf. Albert, 13 T.C. 129; Carroll, 20 T.C. 382; Johnson, 17 T.C. 1261; Jones, 13 T.C. 880. See also Selby, ¶ 55,005 P–H Memo TC; Kuris, ¶ 56,163 P–H Memo TC; Loden, ¶ 56,029 P–H Memo TC.

In reversing the Tax Court the Court of Appeals for the Ninth Circuit may have given the taxpayer a victory, for, in announcing a new test to replace the "temporary—indefinite" distinction, it has in effect acknowledged that the taxpayer may be forced to move his home, on penalty of losing his travel deduction, only when "there is a reasonable probability *known to him* that he may be employed for a long period of time at his new station." 283 F.2d at 495 (Emphasis by the Court).

6. Recent decisions show a distinct anti-taxpayer trend. Some cases hold against the taxpayer who does not take his family because the job is indefinite, Le-Towt, 22 T.C.M. 547 (1963), aff'd, 328 F. 2d 621 (3 Cir. 1964), and others find he moved his home when the family found temporary lodging at each new job site. See Brown, ¶ 64,186 P–H Memo TC, relying on Garlock, 34 T.C. 611.

characterized as a non-itinerant worker having a fixed place of abode in a general area that could be called his tax home. It is in this third category that we find Whitman's case to fall.

Just as each case must be determined on its own facts, Peurifoy v. Commissioner of Internal Revenue, 358 U.S. 59, 79 S.Ct. 104 (1958), prior cases must be examined in light of the particular facts of each in order that proper weight be given the myriad factors in the balance between deductibility *vel non*.

Among the cases in which the commissioner was successful and in which the facts are close to those in the case here presented are the following: United States v. Mathews, 332 F.2d 91 (9 Cir. 1964), involved a journeyman electrician who had lived with his family in Boise, Idaho, where he belonged to a union. The union was his source of assignment for the jobs on which he worked during the taxable years. The taxpayer moved his family into a mobile home he owned near the damsite where he worked, and sent his children to school there. Even though his wife often stayed with her parents in Nampa, Idaho, and when he visited there he purchased "a lot of stuff, furniture, T. V. set and * * * groceries," taxpayer "did not maintain a 'home' in either Boise or Nampa during the years in question, and hence was not 'away from home' as contemplated by section 162 while he lived with his family in his trailer at the Brownlee site." 332 F.2d at 93.

James v. United States, 308 F.2d 204 (9 Cir. 1964), involved a salesman who claimed Reno was his home as his "headquarters" was there; he kept bank accounts, a post office box, and filed his income tax return from there. However, when he was in Reno he stayed in a hotel. In affirming a decision favorable to the government the court states, " * * * a taxpayer has a 'home' for this purpose only when it appears that he has incurred substantial continuing living expenses at a permanent place of residence."

In Fisher v. Commissioner of Internal Revenue, 230 F.2d 79 (7 Cir. 1956), the taxpayer, who was characterized as "an itinerant professional musician" by the court, and who had lived in Milwaukee, registered to vote, paid State income tax, and purchased license plates for his car there, was refused the deduction for traveling expenses even though he lived there in an apartment with his mother-in-law, paying no rent but sharing household expenses.

Armstrong, ¶ 63,232 P–H Memo TC, was a professional entertainer who was in constant travel status; the Court held that there was no "home" to be away from for section 162(a) (2) purposes, even though he rented a place in Reno for his parents and stayed there from time to time. Ullom, ¶ 58,201 P–H Memo TC, was a member of a "floating crew" required to go to whatever job site his employer sent him, where he and his family maintained themselves in a trailer. He often used the home of a son-in-law in a city where he kept a post office box, purchased insurance and license plates, maintained church and union membership and kept parakeets as a hobby. Finding that the fact he called the room in his son-in-law's house "home" when he visited there on week ends and vacations was of little consequence, the Court held that the taxpayer's home was located in the trailer which was moved from job to job.

Osburn, ¶ 58,063 P–H Memo TC, owned a house in Enid, Oklahoma, where relatives lived, to whose support he contributed. A steelworker, taxpayer belonged to a union in Detroit, and lived in hotels and motels as he moved from job to job. Although he intended to return to Enid, he had not lived in the house for 14 years, and visited there only once or twice a year. The Court said, "[i]t is clear that petitioner lived away from Enid, and his home or place of abode was where his job happened to be."

Among the cases involving situations factually somewhat similar to the case presented here and in which the taxpayer was successful are the following: Coburn v. Commissioner of Internal Revenue, 138 F.2d 763 (2 Cir. 1943), dealt with the claimed deduction of an actor of the legit-

imate stage who spent 263 days in Hollywood filming a motion picture. He maintained an apartment in New York City which served as his business office, his residence, and the residence of his 83-year-old mother-in-law and her female companion. The Court found the taxpayer's "home" to be in New York City, "whether the word be construed in its usual domiciliary sense or in the special 'tax sense'" urged by the commissioner. 138 F.2d at 765.

Miss Hall, ¶ 64,157 P–H Memo TC, was a professional ice skater employed 10 or more months a year by the Ice Follies. She was born and reared in Spokane, and lived there with her mother during her 5 or 6 week vacations. She had lived there during her marriage and had at all times assisted in the maintenance of the family home, where she kept her personal belongings. She votes, licenses her automobile, and conducts her business from Spokane. In holding for the taxpayer the Court found that "she had a business home base in Spokane, as well as her personal home, for the relevant purposes of sections 62(2) and 162(a) (2). She was neither a homeless nor an itinerant individual."

Weidekamp, 29 T.C. 16 (1957), had lived in Louisville all his life. He filed Kentucky Income Tax returns and paid maintenance and taxes on his mother's home there. He was a parimutuel calculator at race tracks and worked 293 days away from home and 38 days in Louisville. In allowing the deduction the Tax Court found taxpayer "could not reasonably be expected to move his residence with each change of jobs."

Leach, 12 T.C. 20 (1949), was a construction worker who maintained a home in Florence, Alabama, where his wife remained. The Tax Court allowed the deduction: "He had no station or place of employment in 1945. His employment required him to be away from Florence for 49 weeks during 1945 and to be for short periods ranging from a few weeks to several months, at various places so remote from Florence that he had to rent lodging for himself at each place."

Gustafson, 3 T.C. 998 (1944), was an unmarried salesman who claimed his home was with his married sister in Greenville, Iowa, and who spent the entire 52 weeks traveling as a circulation promoter of a trade juornal. The evidence showed he spent week ends and kept his clothes at his sister's house; he voted and paid income tax in Iowa. The Tax Court found he had a home and allowed the deductions.

Schurer, 3 T.C. 544 (1944), was a journeyman plumber from Pittsburgh who owned a home and belonged to a union there. In allowing him to deduct his traveling expenses the court noted that he worked four weeks in one place, nine in another and 33 in another, during the taxable year.

From this mere sampling of the cases under section 162(a) (2) it should be apparent that neither reconciliation nor deduction of a universally applicable rule is possible. Striving to maintain a maximum degree of uniformity, however, and considering the countless factors which must be weighed under the taxing statute, each being given its proper weight, we feel constrained to hold in favor of the government. Thus it is our conclusion that the facts as a whole tend to show that the taxpayer's regular place of abode in a real and substantial sense was not in Choudrant but was rather in his mobile home where he and his family lived at each job site.

We are impressed by the following factors in the case here presented which, when properly weighted, tip the balance in favor of the government: During the taxable years the taxpayer maintained a home-like atmosphere in his trailer at each job site;[7] the home in Choudrant was maintained more for the convenience of his aged parents than as his own home;[8] taxpayer secured his job assignments through personal contract with em-

---

7. See United States v. Mathews, 332 F.2d 91 (9 Cir. 1964).

8. See Osburn, ¶ 58,063 P–H Memo TC.

ployers rather than through assignment by his local union;[9] taxpayer's brief stays at Choudrant were more like visits away from home than the opposite, as claimed by him;[10] and lastly, it was his intention upon retirement from the construction business to return to his farm in Chatham, where he had on one occasion actually resided in his mobile home, rather than the claimed home in Choudrant. Ultimately, we are convinced that taxpayer's trailer was his place of abode in a real and substantial sense, and while he resided there he was not incurring "traveling expenses * * * while away from home * * *" under section 162(a) (2).

■■ The second issue before us is whether the losses incurred in Whitman's cattle-raising activities are deductible as business expenses in the taxable years 1960 and 1961 under section 165(a) or section 172 of the Code. Although, again precedent is helpful for the development of guides to a proper decision, each case must be decided on its own facts. The primary guideline which is basic in the qualification of an enterprise or activity as a trade or business under the Code is that ultimately the taxpayer intends to realize a profit therefrom. In fact the dominant factor in determining whether a taxpayer was engaged in a venture for profit or merely for pleasure is his intention at the outset. Tatt v. Commissioner of Internal Revenue, 166 F.2d 697 (5 Cir. 1948); Hirsch v. Commissioner of Internal Revenue, 315 F.2d 731 (9 Cir. 1963).

Reg. § 1.165–6 states that, subject to certain immaterial exceptions, any loss incurred in the operation of a farm shall be allowed as a deduction if the farm is operated by the taxpayer as a trade or business, even in addition to his being engaged in another trade or business, but that a loss incurred in the operation of a farm for recreation or pleasure shall not be deductible. Reg. § 1.162–12 provides in part:

"A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming * * *. The purchase of feed and other costs connected with raising livestock *may* be treated as expense deductions insofar as such costs represent actual outlay * * * [But] the cost of farm machinery, equipment, and farm buildings represents a capital investment and is not an allowable deduction as an item of expense. Amounts expended in the *development* of farms, orchards, and ranches prior to the time when the productive state is reached *may* be regarded as investments of capital * * *. If a farm is operated for recreation or pleasure and not on a commercial basis * * * the expenses incurred will not constitute allowable deductions." (Emphasis added)

The government contends that, while the taxpayers aspired to enter into the cattle business at some time in the future, during the years 1960 and 1961 they were not in that business, but rather were in the process of gathering together assets in anticipation of entry into the business, they *must* capitalize such expenditures and recover them in later years through depreciation or sale of the assets. In answer to this contention suffice it to say that, unless the expenditure be characterized as "made during the preparatory period in establishing a farm, ranch, orchard, or grove,"[11] the regulations

9. Cf. Rev.Rul. 60–189, 1960–1 Cum.Bull. 60.

10. See Ullom, ¶ 58,201 P–H Memo TC.

11. The Commissioner has apparently elaborated on Reg. § 1.162–12 in the Farmer's Tax Guide, 1961 Edition (U.S. Treasury Dept., I.R.S. Publication No. 225), pages 29 to 30:

"*Capital Expenditures*
* * *
"*Preparatory and development costs*
"The three definite periods in the life of a farm, ranch, orchard, or grove are (1) preparatory, (2) development, and (3) productive.
"*Preparatory period.*—Expenditures made during the preparatory period in

clearly give the taxpayer the option to capitalize expenditures which are incident to current operations or to deduct them as current expenses. Reg. 1.162–12 supra. It is only when the operation reaches its productive period [12] as a full-fledged operating business (and Whitman's was admittedly not productive in the taxable years) that the taxpayer loses the option to capitalize his expenditures and must deduct them as current expenses. The issue then, as we see it, resolves itself into whether, on the basis of the facts in the record, Whitman entered into the cattle-raising activity as a trade or business with the intention to realize a profit therefrom, and, if so, whether that activity during the taxable years was beyond the preparatory period and into the development period so that his current expenditures are deductible.[13]

It has often been difficult to determine when a farm is operated as a business enterprise for profit or as a country estate for pleasure. Since the dominant factor is that of intent at the outset, each case must be treated with relation to its own facts. Where there are substantial recurrent losses, the amount thereof and the relation of receipts to expenditures are merely evidentiary facts to be taken into consideration together with other facts including the testimony of the taxpayer as to his intent. Wright v. United States, 249 F.Supp. 508 (D.C.Nev.1965); Du Pont v. United States, 234 F.Supp. 681 (D.C.Del.1964). But in Thacher v. Lowe, 288 F. 994 (S.D.N.Y.1922), where a lawyer operated a farm for several years with a deficiency of 90 per cent., it was held that he would not with reason expect to make a profit and the deduction was disallowed. Recently, in Godfrey v. Commissioner of Internal Revenue, 335 F.2d 82 (6 Cir. 1964), the taxpayer, an executive of General Motors Corporation, also engaged in the breeding, raising and selling of cattle. The ap-

establishing a farm, ranch, orchard, or grove may not be deducted. They must be capitalized. The following are typical preparatory expenditures (including material and labor costs), and must be capitalized.

1. Clearing brush, trees, and stumps.
2. Leveling and conditioning land.
3. Trees and the planting of trees.
4. Drilling and equipping wells.
5. Building irrigation canals and ditches.
6. Laying irrigation pipes.
6. Installing drain tile.
8. Straightening creek beds.
9. Constructing earthen, masonry, or concrete tanks, reservoirs, or dams.
10. Building roads.

"A depreciation deduction may be claimed for any of the above items which are of a depreciable nature * * *.

"You may elect to capitalize taxes and interest and other carrying charges during this period.

"*Development period.*—During the development period you may capitalize your expenditures which are incident to current operations or you may deduct them as current expenses. *Expenditures of a capital nature, however, may not be deducted in any stage,* unless they are for soil or water conservation. Some of the expenditures which you may either capitalize or deduct during the development period are the cost of upkeep, taxes, interest and other carrying charges, water for irrigation, fertilizer, controlling undergrowth, and cultivating and spraying of trees. (Emphasis that of the Commissioner)

"*Productive period.*—When the farm, orchard, grove, or ranch reaches its productive period you lose the option you had during the development period. The business is now a full-fledged operating business. Ordinary and necessary expenses cannot be capitalized * * *."

12. Ibid.

13. In Edwin H. Miner, ¶ 62,222 P–H Memo TC, the following language was used: "Before a taxpayer can be said to be engaged in a trade or business, we believe that at least two conditions must be present: (1) He must have the motive and intention of realizing a profit; and (2) activities must be of that type or character which will constitute the present carrying on of a business, rather than activities of preparing to enter and carry on business at some future time."

pellate court approved the lower court's conclusion:

"We believe from our consideration of the evidence, that petitioner's primary purpose in buying and developing the farm as a whole, was not to establish a business with which to augment his already large income, but rather to gratify his desire to establish a substantial country estate."[14]

But taxpayers have been by far the more successful in litigation involving similar facts. For example, in Farish v. Commissioner of Internal Revenue, 103 F.2d 63 (5 Cir. 1939), the taxpayer engaged principally in the oil business, where his annual income was in excess of $100,000. During the taxable year he sustained considerable losses in the breeding, development and training of polo ponies, which requires a period of about 8 years before the animals are salable. In finding for the taxpayer the court noted that the enterprise had been in operation for only five years, and could not expect to make a profit for several more years, a factor which could not negative his intention to reap a profit eventually. Similarly, in Tatt v. Commissioner of Internal Revenue, 166 F.2d 697

(5 Cir. 1948), the taxpayer was in the produce business. In reversing the Tax Court's refusal to allow the deduction for farming losses the court noted that the taxpayer had never had a profit. It held that "intent may be proved by circumstances, and that a party's testimony as to his intent may be rebutted by proof of circumstances which are inconsistent therewith," but where it was not rebutted it was error to find for the Commissioner.

Recently, in Du Pont v. United States, 234 F.Supp. 681 (D.C.Del.1964), taxpayer was the owner of a Subchapter S corporation[15] engaged in the breeding and raising of a high quality strain of Santa Gertrudis cattle. Because of the long time necessary to develop a profitable herd, the taxpayer had substantial net operating losses in his farming operation. In holding for the taxpayer despite the fact he was apparently quite wealthy and often engaged in extravagant fox hunting sorties on the farm, the court noted, "[t]he cattle business is not being conducted on a plus basis as part of a fancy country estate, but has every appearance of being a large-scale, practical operation which is being carried on with an eye to effecting every possible economy."[16]

14. 335 F.2d at 84. See also Coffey v. Commissioner of Internal Revenue, 141 F.2d 204 (5 Cir. 1944), where a decision of the Tax Court was affirmed in which a taxpayer, whose occupation was not stated but who had income during the taxable year in the amount of $160,-000, was denied a deduction of a loss in the operation of a citrus grove, the court concluding "that the greater emphasis was upon the cultivation of the orchard as an adjunct to the [taxpayer's] country estate, rather than as a business venture." 141 F.2d at 205. In Schley v. Commissioner, ¶ 65,111 P–H Memo TC, the taxpayer's motive was the "love of farming," not profit even though there was a history of buying and selling of cattle over a period of many years.

15. The purpose of Subchapter S of the Internal Revenue Code of 1954, sections 1371 et seq., was to permit "small business corporations," as defined by the statute, to elect not to pay a corporate tax, but instead to permit the corporate

profits or losses to be reported by the stockholders in their individual returns. See Sen.Rep.1983, 85th Cong. 2d Sess., U.S.Code Cong. & Admin.News 1958, p. 4791; 1958–3 Cum.Bull. 922, 1008.

16. 234 F.Supp. at 688. See also the following cases decided on substantially similar facts: Commissioner of Internal Revenue v. Field, 67 F.2d 876 (2 Cir. 1933) (banker engaged in the operation of a farm for raising horses); Wilson v. Eisner, 282 F. 38 (2 Cir. 1922) (fact taxpayer also engaged in racing the horses he raised did not alter his profit intent); Plant v. Walsh, 280 F. 722 (D.C. Conn.1922); Wright v. United States, 249 F.Supp. 508 (D.C.Nev.1965) (where, in allowing the deduction, the court explicitly accorded little weight to evidence that the taxpayer received substantial taxable income aside from the pure-bred livestock breeding enterprises); John S. Ellsworth, ¶ 62,032 P–H Memo TC.

■ We think the preponderance of the evidence plainly shows that Whitman commenced the cattle raising business on his farm with the intention of developing it into a profitable enterprise, and that his conduct demonstrates that intention. Although there were only six cattle on the 143 acres during the taxable years, both herd and acreage have been increased substantially in more recent years. Further, even though the jurisprudence accords little weight to amount of taxable income received from other sources, we perceive some importance in the fact that Whitman is a construction worker, having achieved the status of master mechanic. Surely it is easier to hold that an executive of General Motors, a banker, or a coupon-clipping fox hunter has engaged in farming for pleasure only, than a construction worker whose wealth is apparently commensurate. Thus plaintiff has shown by his own testimony and by corroborating circumstances his profit motive, and this has not been rebutted by the government.

Turning to the question whether, notwithstanding the profit motive, taxpayer's expenditures were made during the preparatory period in establishing the farm, and must be capitalized, or made during the development period thus giving the taxpayer the option to deduct current expenses as net operating losses,[17] in a significant Tax Court decision, Edwin H. Miner, ¶ 62,222 P–H Memo TC, the taxpayer was a college president who resided on a 58 acre farm near his work. It was his stated intention to build up a herd of 19 or 20 Hereford cattle "in order to break even, or perhaps to realize a small profit" from the activity. During the taxable years he maintained from two to three animals, and in subsequent years he decided to discontinue the enterprise completely, having never reached the intended number. In disallowing the taxpayer's claimed deduction the court remarked:

"In our view, the most that can be said of petitioner's beef-raising activities during the taxable years here involved (as well as before and after that) is, that he was endeavoring to build up a herd of animals which would enable him to engage in a cattle business, that *might* prove profitable at some future time. The expenses incident to such a herd build-up were, accordingly, of a capital nature, and hence not currently deductible. They were analogous to the amassing of the capital assets such as the plant and machinery of a manufacturing business, preparatory to the actual beginning of business operations." (Emphasis by the Court)

Thus taxpayer's activities were characterized by the court as falling within the preparatory period in establishing the enterprise.[18]

While we feel the conclusion in Miner remains open to debate, it is sufficient to decide on the basis of the facts presented in the case before us that Whitman's beef-raising activities had passed the preparatory stage and were firmly entrenched in the development stage, thus entitling him to deduct current expenditures if he so desired. The salient factors leading us to this conclusion include Whitman's intention to devote his full energies to the cattle business when it reaches the productive period, the businesslike manner in which it was operated

17. See note 11 supra.

18. The government has cited Chapman & Dewey Lumber Co. v. United States, 238 F.Supp. 869 (W.D.Tenn.1965), as support for its contention that Whitman's cattle raising business was in its preparatory period. In that case the taxpayer was engaged in reforestation, and claimed deductions for expenditures which clearly are typical of the preparatory period, viz., clearing of land, dragging a disc over the land, making holes with spikes for seedlings, procuring the seedlings, keeping the seedlings free of other growth for a period of two years, labor expense for the work done, depreciation of the machinery used, and gasoline and other supplies. There is little if any similarity between these two cases other than they both involved claims for the deductibility of farming losses.

during the taxable years, the encouraging results of breeding achieved in recent years, the low market for beef in the taxable years, and the nature of the expenditures claimed as farming losses, viz., feed, insurance, utilities and depreciation of fence, barn and animals.

We have examined the authorities cited by the government, which urge application by analogy of cases dealing with the commencement of commercial enterprises, such as television broadcasting, Richmond Television Corp. v. United States, 345 F.2d 901 (4 Cir. 1965), and find them inapposite. In our determination of this matter we have been guided by the extremely well prepared and articulate briefs of opposing counsel. And after a diligent re-examination of all briefs and supplemental briefs we are unable to discern any matter which either adds to or subtracts from the above decision.

It has been stipulated that the Government shall compute the refund due. Let an appropriate decree be presented.